**Willie B. JACKSON, Plaintiff,**

v.

**Anthony M. FRANK, Postmaster General, United States Postal Service, Defendant.**

**No. 4:90CV220 FRB.**

United States District Court, E.D. Missouri, Eastern Division.

May 4, 1994.

Carter C. Law, Federal Public Defender, Karen E. Milner, Sonnenschein and Nath, St. Louis, MO, for plaintiff.

Henry J. Fredericks, Asst. U.S. Atty., Office of U.S. Atty., St. Louis, MO, for defendant.

## MEMORANDUM AND ORDER

BUCKLES, United States Magistrate Judge.

This matter is before the Court for decision following a trial before the Court without a jury. The case was referred to the undersigned United States Magistrate Judge for trial and all other proceedings, with consent of the parties, pursuant to 28 U.S.C. § 636(c). Plaintiff brings this cause of action under Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000(e). Plaintiff alleges that he was unlawfully discharged from employment by the United States Postal Service on account of his race and sex. From the testimony and evidence adduced at trial, pursuant to Rule 52(a), Federal Rules of Civil Procedure, the undersigned makes the following Findings of Fact and Conclusions of Law:

### Findings of Fact

1. Plaintiff, Willie B. Jackson, a black male, was employed by the United States Postal Service beginning in July, 1984. Jackson was finally terminated from employment with the postal service on January 8, 1988. The plaintiff had satisfactorily performed his duties as a postal service employee until the occurrence of an incident on November 4, 1987, which led to his discharge.

2. On November 4, 1987, plaintiff was working as a mail handler at the Bulk Mail Center (BMC), Hazelwood, Missouri. His job consisted of loading mail sacks onto truck trailers.

3. On November 4, 1987, Paul Cope, another mail handler at BMC reported to his acting supervisor, Frankie Rodgers, that the plaintiff, Willie B. Jackson, had come to the trailer where Cope was working and accused Cope of reporting to supervisory officials that Jackson had taken "leave" from work when Jackson was not entitled to do so. Cope reported to Rodgers that Jackson had struck him in the face and neck area. Rodgers noticed red marks on Cope's face and neck. Cope appeared shaken and upset. Cope also told David Schell, Rodgers' supervisor, that Jackson had threatened to kill him if he ever again said anything about Jackson to management personnel.

4. Rodgers located Jackson sitting in the break room and took him to the office. Rodgers asked what had happened between Jackson and Cope. Jackson asked to be told what Cope had reported. Rodgers related Cope's statement. Jackson denied that he had struck Cope and said that he had merely pointed his finger at Cope.

5. Rodgers, who was an employee acting as supervisor in place of the regular supervisor, then contacted David Schell, general supervisor of the BMC. Rodgers contacted Schell because he believed Schell was more familiar than he about the procedures to be followed in the circumstances presented.

6. Schell came to the office and spoke to both Cope and Jackson. Schell asked both men to provide written statements as to what had occurred. Cope did so. Jackson refused to do so until after he could consult with a union official. He later did so and made a brief written statement. Schell dispatched Cope to a medical clinic for treatment of his injuries. Schell also contacted postal inspectors and asked them to conduct an investigation.

7. Postal Inspector G.D. Paul came to the BMC facility on November 4, 1987, at

Schell's request. He conducted an investigation of the attack on Paul Cope. He interviewed Cope and Cope reiterated what he had told Rodgers and Schell. He also told Inspector Paul that Jackson had threatened to kill Cope if Cope reported the attack to authorities. Inspector Paul also interviewed Schell and Rodgers. Inspector Paul learned that Jackson had claimed that the marks on Cope's neck and face were caused by blows inflicted by Cope upon himself. Inspector Paul also interviewed two witnesses, Michael Domahowski and Larry O'Neal, who told Inspector Paul that they had not witnessed any altercation between Jackson and Cope. Both witnesses did recall that Cope came into the break room while Jackson was there and that Cope was angry. However, neither witness had seen Cope inflict any harm upon himself. Inspector Paul attempted to interview Jackson but Jackson refused to be interviewed without an attorney present. Inspector Paul also took photographs of Cope's injuries and obtained a copy of the medical records of Cope's treatment on November 4, 1987. Inspector Paul filed his written report with the manager of the BMC on November 12, 1987.

8. Late in the evening of November 4, 1987, Schell notified both Cope and Jackson that they were being placed on paid administrative leave pending completion of the investigation. Both were then allowed to leave the facility.

9. Eldridge Gilliam, the regular postal service supervisor of Jackson and Cope was on leave at the time of the occurrence on November 4, 1987. When Gilliam returned from leave several weeks later, Schell, Gilliam's immediate supervisor, assigned to Gilliam the task of reviewing the material and information which had been gathered during the investigation of the matter, including Inspector Paul's report, and to determine what action, if any, should be taken. Gilliam reviewed the materials. After conducting his review, Gilliam tended to believe the version of the events as related by Cope and tended to disbelieve the version of the events as related by Jackson. Following his review, Gilliam made a Request for Disciplinary Action—Removal for both employees. Gilliam made this request because he believed that it

was the only course of action available to him when the evidence showed employees to be involved in an altercation. Schell, Gilliam's supervisor, concurred in the request.

10. Both Jackson and Cope were notified in writing by Gilliam of the proposed disciplinary action of removal. They were also notified that they had the right to answer the proposal by appearing before or writing to the Director of Mail Processing at the BMC who was the decision maker as to what disciplinary action, if any, would be taken in the matter. Jackson and Cope were also notified of their right to file a grievance regarding the matter.

11. Jackson did appear, with a union representative, before Lawrence H. Matthews, Acting Director of Mail Processing at BMC, on December 11, 1987, to reply to the Request for Removal. At that time Jackson again denied hitting Cope. Jackson told Matthews that Cope injured himself when he fell down in the break room. Jackson also told Matthews that the actions taken against him were racially motivated. On December 29, 1987, Matthews issued a Letter of Decision to Jackson notifying him that he had determined that removal of Jackson from employment was the appropriate disciplinary action in the circumstances, and setting out his reasons for that determination. He also advised Jackson in his letter that he could find no support for his claims that the actions taken in this matter were racially motivated. In the letter, he also notified Jackson of Jackson's right to appeal the decision to the Merit Systems Protection Board (MSPB) or of filing an EEO complaint with the postal service. At Matthews' direction, the Notice of Proposed Removal that had been issued to Cope was withdrawn and Cope was directed to return to work at the BMC.

12. Matthews made his decisions regarding the discipline to be imposed based on his review of the report prepared by Inspector Paul, the photographs depicting Cope's injuries, the statements made by Jackson to Matthews on December 11, 1987, and personal interviews that Matthews conducted with Cope, Rodgers, Domahowski and O'Neal concerning the incident. Matthews found Jackson's explanations and continued denials not

to be credible and contradicted by other evidence. Based on the evidence, he concluded that Jackson had committed an unprovoked physical attack on Cope and that there were no mitigating circumstances. He also concluded that Jackson had threatened to kill Cope if Cope told of the attack.

13. Jackson and the National Mail Handlers Union, Local 314, filed a grievance of Jackson's discharge and, pursuant to the terms of the Labor Agreement, the matter was submitted to arbitration. A hearing was held before Arbitrator Albert A. Epstein on April 22, 1988. After the hearing, the arbitrator filed an opinion on August 5, 1988, in which he found that the postal service had just cause for the discharge of Jackson. As had Matthews, the arbitrator found Cope's version of the events to be credible and Jackson's version and explanations not to be credible. The arbitrator also found that the evidence did not support the contention of Jackson and the union that Jackson's discharge was racially motivated.

14. Jackson also appealed his discharge to the Merit Systems Protection Board which, after a hearing, denied his claim on March 29, 1989. Jackson appealed the denial and the petition for review was denied by the Board on July 24, 1989.

15. Jackson also filed a petition for review of the decision of the Merit System Protection Board's initial decision with the Equal Employment Opportunity Commission Office of Review and Appeals which issued its decision denying Jackson's claim on December 18, 1989.

16. In determining the appropriate discipline to be imposed in a particular case, reviewing officials consider the circumstances of each case; the seriousness of the altercation; the strength of the evidence, including the credibility of the individuals involved; and information from other witnesses and the credibility of those witnesses. These standards were used in the determinations made in this case.

17. On some occasions, when an initial recommendation is made that an employee be removed from employment as a result of an altercation, some resolution short of discharge is reached through negotiations between union and postal service officials during the grievance procedure or on appeal to the Merit Systems Protection Board or in decisions made by an arbitrator.

18. The plaintiff here was discharged from his employment with the postal service after he sought out and committed a physical attack upon Paul Cope, a fellow employee. The attack took place at the work facility. Cope was injured and the injuries required medical attention. The attack was unprovoked and occurred because Cope complained to supervisory officials that the plaintiff was violating established work rules. Following the attack, the plaintiff told Cope not to complain to supervisors about plaintiff's work activities. The plaintiff also threatened to kill Cope if Cope disclosed that he had been attacked by the plaintiff. The attack so upset Cope that he notified his supervisor. Cope told the supervisor that he could not work under these conditions. The plaintiff denied that he struck Cope and gave conflicting accounts of events. The plaintiff originally said that Cope had punched and hit himself in the face and neck, thus accounting for his injuries. The plaintiff later claimed that Cope had fallen in the break room and had thus injured himself. All of the reviewing officials found these explanations not to be credible and contradicted by other evidence. Corroborating evidence supported Cope's version of events. The reviewing officials believed Cope to be a credible witness. The reviewing officials believed this to be a very serious occurrence meriting plaintiff's removal from employment.

19. A number of other employees at the BMC, both black and white, male and female, who had been involved in altercations, were disciplined but were not removed from their employment with the postal service. The discipline imposed in such cases usually consisted of a period of suspension from duty without pay. In some of these cases, the discipline originally recommended by the fact finding and decision making official was removal from employment, but the discipline was reduced to a term of suspension through negotiation during the grievance procedure, or on appeal, or through arbitration.

20. The evidence adduced concerning other incidents in which employees were disciplined following an altercation, but not ultimately discharged from employment, does not demonstrate that the occurrences were so similar to that here so that the undersigned can infer that the plaintiff was treated differently from those other employees on account of his race and sex.

21. Plaintiff contends that evidence of discriminatory intent can be found in the fact that David Schell assigned Eldridge Gilliam to review the investigation and to determine what action was to be taken. The plaintiff claims that the review should have been made by Frankie Rodgers, the acting supervisor who was on duty at the time of the incident. It was Gilliam's understanding that the acting supervisor did not have authority to make such reviews and recommendations. This understanding on Gilliam's part was apparently incorrect. It appears that supervisors did have authority to make such decisions. Schell assigned Gilliam the task of reviewing this particular case and making a disciplinary recommendation because Gilliam was the regular supervisor of both of the employees and had more experience than Rodgers. The undersigned does not agree with the plaintiff who contends that in so doing, Schell was attempting to manipulate the review process to permit the implementation of a discriminatory motive. Under all of the circumstances here, the undersigned does not believe that to be a reasonable inference from the evidence and declines to draw such inference.

### Discussion

■ 1. The plaintiff brings this claim under Title VII of the Civil Rights Act of 1964, claiming that he was removed from employment by the United States Postal Service on account of his race and sex. The question to be determined by the Court is whether the defendant intentionally discriminated against the plaintiff, that is, did the defendant treat the plaintiff less favorably than other employees on account of his race and sex. *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983).

■ 2. The burden of proving intentional discrimination is upon the plaintiff. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). The plaintiff may meet this burden "either directly by persuading the Court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation (if one is offered) is unworthy of credence." *Id.* at 256, 101 S.Ct. at 1095. *See also McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804–05, 93 S.Ct. 1817, 1825–26, 36 L.Ed.2d 668 (1973).[1]

■ 3. The defendant discharged the plaintiff for a legitimate, non-discriminatory reason, that is, a violation of rules prohibiting altercations between employees. *Green v. Armstrong Rubber Co.,* 612 F.2d 967 (5th Cir.), *cert. denied,* 449 U.S. 879, 101 S.Ct. 227, 66 L.Ed.2d 102 (1980).

■ 4. The plaintiff contends that the claimed reason for his firing, namely the attack committed by him upon fellow employee Cope, is merely a pretext advanced by the defendant to disguise its actual motive in discharging the plaintiff, namely his race and sex. The plaintiff may recover under Title VII if he can demonstrate that his discharge was motivated by race and sex and that the supposed reason advanced by the defendant for his removal was pretextual. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804–05, 93 S.Ct. 1817, 1825–26, 36 L.Ed.2d 668 (1973). *Burdine, supra.*

■ 5. One of the ways in which the plaintiff may demonstrate that the proffered reason for his discharge is pretextual is by showing that he "was discharged for conduct which was nearly identical to that engaged in

---

**1.** The plaintiff has urged that the Court follow the case method established in *McDonnell Douglas* to analyze his claim. This methodology was rejected by the Supreme Court in *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).

There the Court said that once all of the evidence had been presented, the proper procedure is for the trial court to proceed directly to the ultimate question of whether the defendant intentionally discriminated against the plaintiff. *Id.* at 715–16, 103 S.Ct. at 1481–82.

by one outside of the protected class whom the employer retained." *Hawkins v. Ceco Corp.*, 883 F.2d 977, 984 (11th Cir.1989); *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1255 (8th Cir.1981). The evidence adduced here regarding other employees does not demonstrate that the circumstances here were nearly identical to those in other cases.

6. The evidence adduced regarding other employees shows that all of those who were shown by credible evidence to have been actively involved in an altercation with a fellow employee (as opposed to being a mere victim) were subjected to disciplinary action. The plaintiff's claim of discrimination arises out of the fact that the discipline imposed upon him was more severe than that imposed upon other employees. However, "[c]ertainly an employer has some discretion to consider all the facts and determine whether the discharge is an appropriate remedy or whether a milder punishment would be more appropriate." *Kendrick v. Commission of Zoological Subdistrict*, 565 F.2d 524, 527 (8th Cir.1977).

 7. The plaintiff contends that the postal service policy with respect to discipline of employees involved in altercations, although neutral on its face, is in fact effectuated by individual supervisors by the use of subjective criteria and that this results in a discriminatory impact on blacks and males. In support of this claim, the plaintiff points to the same evidence which he claims as support for his assertion that the proffered reason for his dismissal was merely a pretext for the actual discriminatory motive behind his removal from employment. However, the fact that some subjective decision making takes place during the evaluation of these incidents and in the determination of appropriate discipline, in and of itself, is not sufficient to support his claim. *Talley v. United States Postal Service*, 720 F.2d 505, 507 (8th Cir.1983), *cert. denied*, 466 U.S. 952, 104 S.Ct. 2155, 80 L.Ed.2d 541 (1984).

 8. The mere fact that Eldridge Gilliam or David Schell, or both, may have misinterpreted or misapplied postal service regulations as to who had authority to review incidents and recommend disciplinary action or may have misinterpreted or misapplied the standards to be used in making such determinations does not in and of itself make out a case for plaintiff absent any discriminatory intent on the part of the employer. *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir.1984). Furthermore, neither Gilliam nor Schell were the final factfinder or decision maker. Lawrence Matthews, the person who determined to remove plaintiff, made a complete review and investigation of the incident, including personal interviews with the persons involved and with witnesses. Matthews then made his own independent judgment as to the discipline to be imposed. Thus, any procedural or judgmental errors by Gilliam or Schell could not have played any part causing the plaintiff's dismissal. The decision made by Matthews was made based on legitimate, non-discriminatory reasons and plaintiff has failed to show any discriminatory motive or intent on the part of Matthews. Therefore, the plaintiff's claim that so-called "irregularities" by Gilliam and/or Schell demonstrate discrimination is without merit. *Clay v. Hyatt Regency Hotel*, 724 F.2d 721, 724–25 (8th Cir.1984).

### Conclusion

For all of the foregoing reasons, the undersigned concludes that the plaintiff was discharged by the defendant on account of his unprovoked attack on a co-worker, a violation of work rules, and that his discharge was not in any way made on account of his race or sex and that the defendant did not in any way intentionally discriminate against the plaintiff on the basis of race or sex.

Therefore,

**IT IS HEREBY ORDERED** that judgment in this matter be entered in favor of the defendant and against the plaintiff.

### *ORDER*

Presently pending before the Court is plaintiff's Motion to Supplement the Record. All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

This matter was tried to the Court without a jury. Following the trial, plaintiff submitted the instant motion seeking to offer additional evidence that was not offered at trial. The additional evidence are: 1) a statement of Eldridge Gilliam, a person who testified at trial, made prior to the trial about some of the matters in issue; and 2) a report prepared by Albert Rush, an EEO counselor, who did not testify at trial, concerning Rush's investigation of plaintiff's complaint of racial discrimination regarding his dismissal from the postal service. Defendant opposes plaintiff's motion.

The undersigned believes that these hearsay statements should not be admitted in evidence after the trial has been concluded. Even if the statements might be admissible under some exception to the hearsay rule, the defendant would be denied the right to cross examine concerning information in the statements or to rebut evidence contained in the statements.

Therefore,

IT IS HEREBY ORDERED that plaintiff's Motion to Supplement the Record (Docket No. 7) is denied.